Paul D. Graves, J.
This is an action to recover the sum of $6,276.30 under the terms of a written agreement whereby plaintiff agrees to sell defendant electric energy produced at its generating stations, known as No. 4 and No. 7, for a term of 25 years. Presently under consideration is plaintiff’s motion for summary judgment pursuant to rule 113 of the Rules of Civil Practice.
The agreement dated January 19, 1951 provides for payment by defendant for use of hydroelectric power of a certain capacity charge, as to which there is no dispute, and provides for additional payments to be made by defendant as follows:
‘ ‘ ENERGY CHARGE
“ Four Mills ($0.004) per kilowatt-hour for all kilowatt-hours generated at the said plants during the month up to the number of kilowatt-hours sold by Niagara-Mohawk during the month to International Talc Company, Inc., and
“ Two Mills ($0.002) per kilowatt-hour for all kilowatt-hours generated at the said plants during the month in excess of the number of kilowatt-hours sold by Niagara Mohawk during the month to International Talc Company, Inc.’s plants.”
*384 At the outset it should be noted the word “ plants ” is twice used in the last-quoted paragraph; quite obviously this word is first meant to refer to hydroelectric generating stations, whereas it is secondly used in reference to talc mills, mines, etc. The contract recites that plaintiff owned only a leasehold interest in the two power plants. The agreement was signed, not only by the parties, but was also approved by the International Talc Company, Inc., as the owner of the power stations leased to plaintiff and as the sole owner of the capital stock of plaintiff.
Payments were made by defendant to plaintiff without dispute until 1954 when the International Talc Company purchased all the common stock of the W. H. Loomis Talc Corporation which operated talc mines and mills in the same general area wherein the International Talc Company mines and mills were located. At the time Loomis was purchased by International, a lease was entered into between them whereby International, for a stated rental, took over the entire operation of the Loomis Talc Corporation’s plants, and International, as of January 1, 1954, began operating the former Loomis Mills No. 2 and No. 3 and Loomis Mine No. 1. Plaintiff contends that the power distributed from its plants to defendant which, in turn, was purchased by International Talc Company, Inc., for use at the plants leased from the Loomis Talc Corporation, should be paid for at the rate of four mills ($0,004) per kilowatt-hour instead of the two mills ($0,002) which has been paid by defendant, and it is this difference of two mills ($0,002) per kilowatt-hour which plaintiff is suing to recover for the months February through August, 1954.
Defendant’s amended answer denies that the wording in the energy charge clause in the contract contained, or correctly expressed, the agreement between the parties, or the intention and understanding of the parties on the execution of the contract, and denies there is any balance due or owing to plaintiff. As a defense, the amended answer also alleges an accord and satisfaction in that plaintiff received checks for the months involved in full satisfaction and discharge of all claims. It further contains a defense and counterclaim consisting of allegations whereby defendant seeks equitable reformation of the energy charge clause to limit the four-mill ($0,004) rate to electric energy generated at plaintiff’s power plants and thereafter sold by defendant to International Talc Company, Inc., to such offices, shops, plants, mines and mills of International Talc as were in existence at the time the contract was executed. This counterclaim was withdrawn and discontinued by stipulation of counsel on June 12, 1957.
*385 As to the defense of accord and satisfaction, plaintiff has conclusively established by documentary evidence presented on this motion that payments were accepted on account and under protest. Defendant does not argue that any question of fact exists in respect to this defense. Moreover, there is no dispute regarding the number of kilowatt-hours of electricity purchased by International for use at the mines and mills leased by International from Loomis Talc. The only question remaining to be decided is whether plaintiff is entitled to summary judgment for the amount demanded in the complaint which, in turn, calls for an examination of the clause in the contract for the payment of the energy charge.
If the words as used by the parties in this disputed clause are unambiguous and clear, considering the entire agreement, then the construction of this clause is for the court and no trial is warranted. (General Phoenix Corp. v. Cabot, 300 N. Y. 87, 92; Bethlehem Steel Co. v. Turner Constr. Co., 2 N Y 2d 456; Brainard v. New York Central R. R. Co., 242 N. Y. 125, 133.)
Defendant contends, as set forth in the answering affidavit of its vice-president that, at the time the agreement was executed, it was the intention of defendant that the mines and mills at which electrical energy sold by the defendant was to be used (and which were to be used as the yardstick for determining payment under the contract at the four-mill ($0.004) rate) were confined wholly and solely to the six sites then owned by International Talc. However, the mere intention of one of the parties, as to what the contract was to mean or signify, will not override or add to clear unambiguous words used in the instrument. As stated by the Court of Appeals in the recent case of Bethlehem Steel Co. v. Turner Constr. Co. (supra, p. 460): “ Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact. It has long been the rule that when a contract is clear in and of itself, circumstances extrinsic to the document may not be considered * * * and that where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary to determine the legal effect of the contract
It is reasonably apparent from a reading of the clause in question, that no specific language has been used to limit the four-mill ($0.004) rate to the sites owned by International at the time the contract was executed. However, defendant contends that the term ‘ ‘ International Talc Company, Inc. plants ’ ’ as *386 set forth in the energy charge clause, is ambiguous so as to require a construction which should not be determined on a motion for summary judgment.
From a reading of the entire contract the court is unable to agree there is ambiguity presented in the words used by the parties. Defendant does not argue that the first provision in the clause, providing for payment of four mills ($0,004) for all kilowatt-hours generated at the plants during the month up to the number of kilowatt-hours sold by Niagara Mohawk during the same month to International, presents any ambiguity. When the second clause, relating to the charge of two mills ($0,002) in excess of the number of kilowatt-hours sold by Niagara Mohawk to International Talc Company, Inc., plants, is read in connection with the first paragraph, the meaning of the words seems clear.
The reading of the other terms of the contract throws some light on the intentions of the parties. It is apparent International Tale is not a stranger to the contract when it is considered it was the owner of the two hydro sites leased to plaintiff, and was also the sole stockholder of plaintiff. Without otherwise considering this contract (see Public Service Law, § 65), it is apparent therefore, that International, through plaintiff, was interested in charging a higher price for the power used by it in its operations to offset the amount which International would have to purchase from defendant. Furthermore, the amount of power sold by plaintiff for eventual use by its parent company can very well be considered as more valuable to plaintiff than the excess generated at its two stations.
The point is, however, that the only restriction set forth by the words of the clause in question is the number of kilowatt-hours generated at the plants during the month, and, with the exception of this restriction, defendant has bound itself to pay four mills ($0,004) per kilowatt-hour for power sold or resold by defendant to International Talc during the month. If there had been any further condition to be applied, the parties could easily have accomplished this by the' addition of a few words restricting the four-mill ($0,004) rate to plants of International then in operation, to the number of kilowatts then being used, or in some similar method. (Cf. Raleigh Associates v. Henry, 302 N. Y. 467, 474.) The court under the guise of construing a contract will not add language to the instrument which the parties could have inserted had they so desired. (Cf. Friedman v. Handelman, 300 N. Y. 188, 194; Heller v. Pope, 250 N. Y. 132, 135.)
*387 Moreover, the word “plants” would seem to be broad enough to include not only mines and mills actually owned by International Talc Company, Inc., but also those which it operated, or would operate, under lease. The distinction urged by defendant between plants owned by International and plants rented by International would seem to be without substantial basis when the word “ plants ” is understood in its ordinary meaning. This is especially so in the present case where it appears defendant is the sole owner of Loomis Talc Company; and the fact that International chose to rent from Loomis rather than take title to the physical assets of this wholly owned subsidiary, would not seem to have a sufficient bearing under the terms of the contract such as to indicate a different meaning. The usual rule is that words used in a business contract are to be construed and interpreted in the light of the understanding of a reasonable business man. (Bird v. St. Paul Fire & Marine Ins. Co., 224 N. Y. 47.)
The contract is, of course, ambiguous in the sense that a definite sum is not stated as to the price to be charged defendant under the energy charge clause. Such sum does not become definite until the monthly amount sold by defendant to International Talc Company, Inc., is ascertained. In this respect, it is analogous to those contracts where the amount to be delivered is not given in figures but is left for future determination, such as amounts based upon the requirements of the buyer or the output of the seller. (See and cf. Edison Elec. Illuminating Co. v. Thacher, 229 N. Y. 172; New York Central Iron Works Co. v. United States Radiator Co., 174 N. Y. 331; see, also, Franklin Sugar Refining Co. v. Lipowicz, 247 N. Y. 465.) However, there is no dispute as to the number of kilowatt-hours pur chased, by International for the months in question which removes any ambiguity which might be said to exist as to the definitiveness of the price to be paid.
After considering the affidavits and exhibits presented on this motion, they do not disclose any ambiguity in the contract, but rather they tend to indicate, in the aggregate, the plans for the sale of the power had been under consideration for a long period of time, and that this contract was executed only after study and negotiations wherein both parties were represented by able counsel and businessmen.
Defendant relies upon three engineering reports, made by one of its employees, as indicating that the plants to be used as a yardstick for the four-mill ($0.004) rate included only those plants, mines, mills and offices existing at the time the contract was executed. These reportes (dated Nov. 9, *388 1949, Feb. 6, 1950 and June 2, 1950) are designed apparently to show the advantage to International Tale of selling the output of the generating stations to defendant. Necessarily the studies are based upon the power requirements of International at its mines and mills then in use. It is set forth in the various reports that the data submitted for the six plants was for the purpose of considering the various proposals and to show comparative costs. Coupled with this are statements to the effect that defendant would sell to International all its power requirements for its uses anywhere at the appropriate rate schedule. It is apparent from these reports that it was contemplated there would or might be an expansion of the need for power by International. It is interesting to note that the second study shows the kilowatts to be annually used by International was 12,718,300, and the third report, which is a supplement to the second, considers the yearly requirements of the talc company as 7,507,240 to 12,718,300 kilowatts depending upon the various plans submitted. While the addition of the Loomis properties increased the requirements of International more than twofold, still the greatest amount of kilowatt-hours used by International for its combined operations, based on the month of March, 1954 (International 443,223 plus Loomis 525,748) totals only 968,971 kilowatts which is not out of line with the engineers ’ maximum estimates. Because the engineers ’ reports were based (probably in part) on the past power used by International, this fact does not establish the parties contemplated these requirements would remain static or unchanged.
Of a similar nature is the letter attached to defendant’s answering affidavit which requests information from International as to its operations. The letter further inquires whether there were any other points at which power is or would be used by International Talc. The reply from International gives the data for its various plants, but does not answer the question as to its future needs. Because of defendant’s failure to further press the question of possible future needs of International, when considered in the light of the talc company’s willingness to provide additional information (see defendant’s Exhibit “B ”), it becomes reasonably obvious the parties could or did foresee the requirements of International would not necessarily remain the same as in prior years, and that defendant must have known this would be so; yet defendant did not attempt to place any limitation upon the four-mill ($0,004) rate.
In support of this view there is also the fact two drafts (at least) of the proposed contract were submitted by defendant *389 before execution of the final agreement. In the first draft offered for consideration, the energy charge clause limited the four-mill ($0.004) rate to the number of kilowatt-hours sold by Niagara Mohawk during the month to International Talc in the 11 immediate vicinity ’ ’ of generating stations 4 and 7. In the second draft, which is stated to reflect the comments made by plaintiff’s representatives at a meeting with defendant’s representatives, the restriction of the four-mill ($0.004) rate to the 1 ‘ immediate vicinity ’ ’ of these power plants was eliminated. It seems therefore established that restrictions or limitations, as to the power used by International which would be paid for at the four-mill ($0.004) rate, had been considered (in this respect at least) and deliberately omitted in the final agreement. Furthermore, there is the rule that the language of a contract is to be construed more strictly against the party who drafted it. (Gillet v. Bank of America, 160 N. Y. 549; Evelyn Bldg. Corp. v. City of New York, 257 N. Y. 501; Taylor v. United States Gas. Co., 269 N. Y. 360.)
An indication of defendant’s interpretation of the contract is contained in its draft of an application to the Public Service Commission relating to the proposed sale of other Oswegatchie property to defendant. This draft contains a statement that, ‘ ‘ The net effect of operation under the contract for sale of the power produced at petitioner’s (plaintiff’s) leased plants will be that Niagara Mohawk will sell direct to International Talc Company all of its electric energy requirements, and will distribute in its own system all the electric energy produced at the hydroelectric plants presently leased to petitioner.” The broad term “ all of its electric energy requirements ” would seem to indicate defendant did not have in mind any restriction as to the amount which International would require. In its contract with plaintiff, defendant has agreed to pay four mills ($0.004) per kilowatt-hour for these power needs which International purchased from defendant.
In the court’s opinion the affidavits and exhibits presented only serve to strengthen its belief there is no ambiguity in the contract such as to create a triable issue of fact. Plaintiff’s motion for summary judgment is therefore granted, with $10 costs.
Submit order and judgment accordingly.