SPECIALTY INSURANCE, et al.,

v.

ROYAL INDEMNITY COMPANY.

Nos. CIV.A. 99–3689, CIV.A. 00–2482.

United States District Court,
E.D. Pennsylvania.

July 9, 2004.

Kenneth T. Levine, Claudia D. McCarron, Nelson Levine Deluca & Horst, Blue Bell, PA, for Plaintiffs.

Craig E. Parles, Herbert C. Klein, Michael J. Palma, Nowell Amoroso Klein Bierman, P.A., Hackensack, NJ, for Defendant.

## *MEMORANDUM & ORDER*

SURRICK, District Judge.

Presently before the Court is Royal Indemnity Company's ("Royal") Motion for Summary Judgment on its Complaint in Civil Action No. 99–3689, (docketed as Royal Indemnity Company's First Motion for Summary Judgment, Doc. No. 36 in 99–cv–3689). For the following reasons, Royal's Motion will be granted as to Royal's claim for breach of contract. Royal's claim based on negligence will be dismissed.

## I. BACKGROUND

### A. Facts

Royal Indemnity Company d/b/a Royal Insurance [1] is incorporated in the state of Delaware, with its principal place of business in Charlotte, North Carolina. Specialty Insurance Agency, Inc. ("Specialty") is incorporated in the state of New Jersey, with its principal place of business in Manasquan, New Jersey.[2] On July 1, 1988, Royal entered into an agreement with Specialty, whereby Specialty would act as

---

1. Royal SunAlliance USA, Inc. is Royal's assignee and successor company.

2. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as this is a dispute between citizens of different states, and the amount in controversy exceeds $75,000.

Royal's agent in an insurance program offered for the restaurant industry. The business relationship, which lasted more than eight years, was governed by the terms of a Managing General Agency Agreement ("MGA"). In entering into the MGA, Specialty, as managing agent, had authority to solicit, underwrite, bind and issue policies in accordance with the "underwriting guideline, [and any] bulletin or instruction which may be issued by Royal from time to time." (MGA at 1–2, Ex. A to Specialty's Motion for Summ. J. in 99–cv–3689.) In accordance with this provision of the MGA, Specialty issued the Restaurant Program Underwriting Guidelines ("Guidelines"), which detailed the program's eligibility requirements. (Ex. D of Royal's Mot. for Summ. J. in 99–3689.) The Guidelines state, in part:

## V. Financial

- Risk must be in business a minimum of three years at the present location.
- Risk must have a D & B [Dun and Bradstreet] report or Profit & Loss [ ("P & L") ] statement available to support the success of the business.
- Any risk having experienced a criminal, civil, or liquor law violation within the last five years *should not be written.*
- Any risk exhibiting signs of financial difficulty (other than shown on the D & B or P & L) such as claim frequency, lawsuits, citations, or revocation of license, *should not be written.*
- Any risk whose principals and/or managers have violated criminal or civil laws *should not be written.*

Financial stability is vital to the success of any business. The best indicator of a financially sound risk is a growing business, under the same management, at the same location for a minimum of three years. Financial stability needs to ensure that the insured can:

- Pay their bills
- Employ capable staff at competitive salaries
- Provide employees and public a properly maintained and safe environment

**Part of your underwriting evaluation should include financial evaluation.**

("Restaurant Program Underwriting Guidelines", Ex. D to Royal's First Mot. for Summ. J (emphasis in original).)

The policy at issue provided comprehensive insurance coverage for Ristorante Mamma Maria, Inc. ("Mamma Maria"), located in Philadelphia, Pennsylvania. The policy was written by Thomas Aderente, Specialty's Vice-president of Underwriting. In 1997, Specialty received two coverage applications from Mamma Maria, one from the Louis Savadove Agency ("Savadove"), and the other from the Butrus and Whalon Agency. (Aderente Dep. at 72–76, Ex. E. of Royal's Mot. for Summ. J. in 99–3689.) Mamma Maria informed Specialty that Savadove was its official broker, and Specialty relied upon the Savadove information to quote and bind coverage. (*Id.* at 81, 82.) The Savadove application indicated that Mamma Maria had been in the same location for five years, but it did not provide additional financial information. (*Id.* at 82 ("Nothing specifically as far as financials go other than that they had been at that location five-plus years . . . .").) [3]

Mamma Maria's coverage was bound effective April 15, 1997. (Aderente Dep. at

---

**3.** The Savadove application, which identifies Claudio and Santa Chiavatti as the owners, also represents that neither Mamma Maria nor its owners has ever been involved in bankruptcy, tax liens, or any litigation. This is not true. Evidently, Aderente did not con-

44, 84.) A D & B report was not issued until April 23, 1997, twelve days after coverage was bound.

> Q: So was coverage already bound on April 23, 1997?
>
> A: Yes.
>
> . . . .
>
> Q: So is it fair to say coverage was bound before you received the Dunn & Bradstreet report; is that right?
>
> A: Yes.

(*Id.* at 89, 90.)

After receiving the D & B report, Aderente received a short note from Attorney John S. Galati, informing Aderente that Galati had been retained to secure a payment plan with the Internal Revenue Service. (Letter from Galati to Whom it May

duct any investigation related to this representation, prior to binding coverage. (Ex. F to Royal's Mot. for Summ. J. in 99–3689.) We also note that the deposition of Richard Lofberg, Specialty's expert witness, states that Specialty's decision to file for bankruptcy was due, in part, to embezzlement within the organization.

> Q. Do you have any idea why it filed for bankruptcy?
> A. Based on the deposition Mr. Chiavat[t]i gave, yes, I do.
> Q. What is the reason?
> A. Mr. Chiavat[t]i's daughter, Paula, had a fiancee who was charged with handling the books at the restaurant. The fiancee was also charged with making payment of taxes and I assume the other bills, everything was paid by check from what I can see, except for various tax payments to the City, the State and the Federal Government.
> . . . .
> And Mr. Chiavat[t]i or his daughter would take the money out for the cash register and give it to him and he would go down and say he made the payments. He did not make the payments. He disappeared before these events, shortly before October of 1996, and as far as I can tell the cash went with him.

(Lofberg Dep. at 86–87.)

Concern of 4/23/1997; Ex. H of Royal's Mot. for Summ. J. in 99–3689.) Aderente also received a copy of a court order dismissing the bankruptcy proceedings. No reason for dismissal was provided. (*Id.* at 98; Ex. I to Royal's Mot. for Summ. J. in 99–cv–3689.)

On June 8, 1997, Mamma Maria was damaged by fire. (Aderente Dep. at 103.) Specialty states that the fire caused approximately $600,000 worth of damage. (Specialty's Brief in Support of Mot. for Summ. J. at 5.) Royal ultimately settled with Mamma Maria for $550,000.[4] (Attanasi Dep. at 44, Ex. M of Royal's Mot. for Summ. J. in 99–3689.)

### B. Procedural History

Royal filed suit against Specialty in the Court of Common Pleas, Philadelphia

In addition, we note that the application asks for total receipts during the past three years. However, the Mamma Maria application states only that its receipts for 1996 were $500,000. (Ex. E to Specialty's Brief in Support of its Mot. for Summ. J. in 99–cv–3689.) Based upon a review of Mamma Maria's daily sales records, there is some suggestion that Mamma Maria was understating its business income.

4. Interestingly, at the time that Specialty was writing this insurance for Mamma Maria, Royal was terminating its relationship with Specialty. The relationship was designated to terminate on March 15, 1997, but that date was extended to June 30, 1997. The Mamma Maria policy was written effective April 15, 1997, and the fire damage occurred on June 8, 1997. After Specialty and Royal terminated their relationship, Specialty started writing insurance for Reliance Insurance Companies. The relationship between Specialty and Reliance was established as early as February 1997, when Specialty signed a letter of intent with Reliance, whereby Specialty would manage Reliance's Restaurant Program. (Letter from B. Moffett to Woychak of 2/5/1997 at 1 ("Specialty Insurance and Security Indemnity Insurance Co. have recently signed a letter of intent with the Reliance Group."), Ex. B24 to Royal's Mot. for Summ. J. in 99–cv–3689.)

County. The case was subsequently removed to this Court on July 21, 1999. Royal's two-count Complaint alleges that Specialty (1) breached its contract with Royal; and (2) was negligent in writing and issuing the Mamma Maria insurance policy.[5]

On August 2, 1999, Specialty filed suit against Royal in the District Court for the District of New Jersey. The case was transferred to this Court in May 2000, and is docketed as 00–cv–2482. Specialty's six-count Complaint alleges: breach of good faith and fair dealing; violations of New York insurance law; breach of contract; and negligent failure to obtain an insurance license. Those claims are not a part of the instant analysis. On April 29, 2002, the two cases were consolidated. (Doc. No. 13 in 00–2482.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party carries this initial burden, the nonmoving party may not rest upon the mere allegations in its pleading, but must set forth specific facts showing that there is a genuine issue for trial. FED. R. CIV. P. 56(e). However, in considering the motion, we will not resolve factual disputes or make credibility determinations, and we must view facts and inferences in the light most favorable to the nonmoving party. *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir.1995).

## III. DISCUSSION

In order to establish a claim for breach of contract, Royal must establish that a valid contract existed, that Specialty breached that contract, and that Royal suffered damages as a result of that

---

**5.** We note from the outset that both counts arise from the same set of facts, and are based on Specialty's alleged breach of the MGA. Under Pennsylvania law, "courts are cautious about permitting tort recovery based on contractual breaches." *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 581 (Pa.Super.Ct.2003) (citing *Glazer v. Chandler*, 414 Pa. 304, 200 A.2d 416, 418 (1964)). As a result, Pennsylvania courts have fashioned the "economic-loss rule," and the "gist of the action doctrine." *Id.* (citing *eToll, Inc. v. Elias/Savion Adver. Inc.*, 811 A.2d 10, 14 (Pa.Super.Ct.2002)). "[T]he economic-loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows from a contract.'" *Factory Market, Inc. v. Schuller Int'l Inc.*, 987 F.Supp. 387, 395 (E.D.Pa.1998) (quoting *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir.1995)). "The 'gist of the action doctrine' bars claims for allegedly tortious conduct where the gist of the conduct alleged sounds in contract rather than tort." *Cortez v. Keystone Bank, Inc.*, No. Civ. A. 98–2457, 2000 WL 536666, at *8 (E.D.Pa. May 2, 2000). This rule precludes "plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract." *Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.*, 246 F.Supp.2d 394, 402 (E.D.Pa.2002) (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 n. 8 (3d Cir.2002)). *See also Bohler–Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 104 (3d Cir.2001) (holding that "a claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts") (quoting *Bash v. Bell Tel. Co.*, 411 Pa.Super. 347, 601 A.2d 825, 830 (1992)). Under the circumstances of this case, it is appropriate to dismiss Royal's negligence claim in Count II of the Complaint, and focus solely on Royal's breach of contract claim.

breach. Neither party disputes the validity of the agreement.

## A. Contract Interpretation

■ Royal contends that Specialty violated the terms of the MGA when Specialty bound Royal to provide insurance coverage to Mamma Maria without proof of financial stability. We agree. The Guidelines clearly express the parties' intent that Royal will not be bound to insure a financially unstable restaurant. The Guidelines even go as far as to explain Royal's reasons for this policy:

> Financial stability is vital to the success of any business. The best indicator of a financially sound risk is a growing business, under the same management, at the same location for a minimum of three years. Financial stability needs to ensure that the insured can:
>
> - pay their bills
> - employ capable staff at competitive salaries,
> - provide employees and [the] public a properly maintained and safe environment.
>
> **Part of your underwriting evaluation should include financial evaluation.**

(Guidelines at § V.) Moreover, it is clear that the overall theme of the Guidelines is that Specialty will not bind Royal to potentially risky applicants. The Guidelines specifically state that the "[r]isk must have a D & B report or Profit & Loss Statement available *to support the success of the business.*" (Guidelines at § V (emphasis added).) It is also clear that the agreement requires that Specialty obtain the positive D & B *before* binding Royal. The phrase "to support the success of the business" makes clear that Royal intended to avoid insuring a restaurant that was financially unstable. Not only should Specialty have obtained a D & B report (or P & L

statement) before binding Royal, the report should have indicated that the restaurant was financially sound. It is undisputed that Specialty did not, at any point, obtain a P & L statement. It is further undisputed that Specialty only obtained a D & B report *after* it bound Royal to coverage of Mamma Maria. Moreover, the report contained multiple warning signs with regard to financial stability. Specialty contends that it is customary in the insurance industry for coverage to be bound before a D & B is available. However, this was obviously not the intent of the Guidelines and the MGA, which clearly and unambiguously provide otherwise.

■ "The objective of contract interpretation is 'to determine what is the intention of the parties as derived from the language employed.'" *Lopez v. Fernandito's Antique, Ltd.*, 305 A.D.2d 218, 219, 760 N.Y.S.2d 140 (N.Y.App.Div.2003). If the meaning is clear, then extrinsic evidence is not admissible. "Where there is a written agreement which purports to express the parties' entire agreement, extrinsic evidence that contradicts, varies, or explains the agreement is generally barred by the parol evidence rule." *Del Vecchio v. Cohen*, 288 A.D.2d 426, 427, 733 N.Y.S.2d 479 (N.Y.App.Div.2001). Under the circumstances, we are compelled to conclude that Specialty failed to live up to its end of the bargain. Its binding of Royal before obtaining a positive D & B report, (or P & L statement), is a direct violation of the MGA and the Guidelines. Specialty never had a D & B report on Mamma Maria that supported the success of the business.

Even if we were to accept Specialty's contention that it is standard in the industry to bind coverage before receiving a D & B, when Specialty finally received the D & B, it failed to meet the clear mandate that "[r]isk must have a D & B report ... available to support the success of the

business." (Guidelines at V, Ex. D to Royal's Mot. for Summ. J. in 99–cv–3689.) Simply stated, the D & B indicated that Mamma Maria was in serious financial trouble. In Specialty's own words, the D & B reported that Mamma Maria had "a bankruptcy, two judgments and a number of tax liens on the property." (Specialty's Brief in Support of Mot. for Summ. J. at 5.) Specialty now attempts to explain away these facts. First, Specialty cites the court order dismissing the bankruptcy, implying that the order, which provides no analysis, was sufficient justification to ignore the bankruptcy information on the D & B. (*Id.*) Specialty also cites a letter from an accountant explaining that Mamma Maria had hired him to negotiate the federal tax liens on Mamma Maria's property, contending that this letter somehow clarifies the tax liens referenced on the D & B. (*Id.*) Specialty then concludes that "[s]ince the insured's financial issues were apparently under control and there was no objective noncompliance with the underwriting guidelines, Specialty made an informed decision to not cancel the policy, although it could have, and allowed coverage to stand." (*Id.*) Even when viewed in a light most favorable to Specialty, the evidence does not support Specialty's conclusion that Mamma Maria was a successful business, and that its "financial issues were apparently under control." At best, the evidence Specialty cites supports a conclusion that Mamma Maria is no longer involved in bankruptcy proceedings, is in the process of negotiating its federal tax liens, and has had two judgments against it. Under any set of facts, this information does not paint a positive financial picture.

As to Specialty's contention that it was industry standard to bind coverage without a D & B, we are not persuaded that that contention is sufficient to trump the clear language of the Guidelines. It would defy logic for Royal to issue these requirements if it had not intended that Specialty adhere to them before putting Royal at risk. As Royal emphasizes, "Specialty's own expert concedes that it is recognized in the industry that poor financial health increases the likelihood that the business will be unable to maintain its property and conduct its business activities in a safe manner." (Royal's Opp'n to Specialty's Mot. for Summ. J. at 13.)

> If you can't pay your bills, you don't do your maintenance. If you can't pay your bills, you don't clean the grills. If you can't pay your bills, you throw the stock down the stair and if you can't pay your bills, your employees are working on tips, and you are hoping that the employee isn't stealing too much from you.

(Lofberg Dep. at 32.)

Moreover, it is undisputed that Specialty, not Royal, had the authority to cancel the policy for material misrepresentation on the application. *See* Specialty's Brief in Support of Mot. for Summ. J. in 99–cv–3689 (stating that "Specialty made an informed decision to not cancel the policy, although it could have, and allowed the coverage to stand"); Aderente Dep. at 111 (stating that one of the reasons for canceling a policy was if Specialty "found material misrepresentation when applying for insurance"). It is also undisputed that the Mamma Maria application contained material misrepresentations. The application stated that neither Mamma Maria, nor its owners, had ever been involved in bankruptcy proceedings. In addition, it stated that they had not been involved with tax liens. The D & B revealed that Mamma Maria had filed for bankruptcy less than six months prior to completing the application. It also revealed that they were subject to tax liens. Specialty argues that once it received the D & B on or about

April 18, 1997,[6] it would have been reasonable for any agent in its position to spend thirty days investigating Mamma Maria's financial strength. (Specialty's Brief in Support of Mot. for Summ. J. in 99–cv–3689 at 17.) Specialty next contends that Pennsylvania law requires that within sixty days of binding a policy, an insurer must provide an insured with thirty-days notice before rescinding the policy.[7] (*Id.*) Finally, Specialty concludes that because the fire occurred on June 8, 1997, which was within sixty days of receiving the D & B, Royal cannot now argue that Specialty should have rescinded the policy upon receipt of the D & B because that rescission could have only reasonably occurred on or after June 17, 1997, several days after the June 8th fire. Thus, according to Specialty, Mamma Maria would not have been precluded from filing its claim. Specialty misses the point. Specialty never should have written the coverage of Mamma Maria in the first instance. After they wrote the coverage and received the D & B, the warning signs were clear. Not only had Mamma Maria lied on its application, the indicators of financial instability were apparent. Nevertheless, Specialty took no action. Whether this all occurred because Specialty was coming to the end of its tenure with Royal or because of shoddy business practices is of no moment. The policy should have been immediately canceled when Specialty received the D & B.

The Guidelines also prohibit Specialty from binding Royal to "[a]ny risk exhibiting signs of financial difficulties (other than shown on the D & B or P & L) such as claims frequency, law suits, citations, or revocation of license." (Guidelines at § V, Ex. D to Royal's Mot. for Summ. J. in 99–3689.) It is undisputed that other than the Savadove application discussed above, Specialty had no information as to Mamma Maria's financial status when Specialty bound coverage. (Aderente Dep. at 81–82, 90, 99, 100, 102.) Specialty's defense is that this requirement is limited to those indicators that do not appear on the D & B because indicators found on the D & B "can be investigated to the agent's satisfaction." Regardless of why the Guidelines distinguish the D & B indicators from financial indicators found elsewhere, the fact remains that the intent of the Guidelines was that Specialty thoroughly investigate the restaurant's financial status before binding Royal. Specialty failed to do this.

In addition, Specialty violated the Guidelines by failing to discover that Mamma Maria's principals had "violated civil and perhaps criminal law" by failing to pay state and federal taxes. (Royal's Mot. for Summ. J. on its Compl. in Civ. A. No. 99–3689 at 21.) The Guidelines state: "Any risk whose principals and/or manager have violated criminal or civil laws *should not be written.*" Specialty argues that there has been no criminal violation because there has been no conviction. Specialty further argues that the definition of a civil law violation is "so vague as to be virtually undefinable." (Specialty's Brief in Support of Mot. for Summ. J. at 10.) It is beyond question that a failure to pay taxes may result in a civil penalty or a criminal penalty. It is also clear that Mamma Maria was subject to state and federal tax

---

**6.** Specialty previously states that the D & B was issued on April 23, 1997. However, this difference is not dispositive in the present analysis.

**7.** Forty Pa. Stat. Ann. § 3407, which applies to coverage of commercial property, states, in part: "An insurer may cancel the policy provided it gives at least 30 days' notice of the termination and provided it gives notice no later than the 60th day, unless the policy provides for a longer period of notification." 40 Pa. Stat. Ann. § 3407(c).

liens. It is not our job to determine the exact status of Mamma Maria's tax debts as it relates to the criminal or civil proceedings. At this juncture, it is sufficient to note that, under the unambiguous language of the Guidelines, failing to pay state or federal taxes, resulting in tax liens, which totaled more than $140,000, is not consistent with the intent of the parties that Royal not be bound to insure a financially unstable restaurant.

With regard to the language, *"should not be written,"* in the Guidelines, Specialty claims that the phrase clearly provides Specialty with autonomy in deciding whether negative financial indicators preclude it from binding Royal to the applicant. Specialty admits that coverage was bound before it received the D & B, and that the D & B reported a bankruptcy, state and federal tax liens, and two judgments. However, Specialty insists that such information does not preclude Mamma Maria from participating in the Restaurant Program, notwithstanding the admonition in the agreement that when such information exists, the business "should not be written." (Aderente Dep. at 90–92, Ex. E to Royal's Mot. for Summ. J. in 99–3689 ("It doesn't not meet the guidelines. It's not excluded or ineligible.").) A reading of the entire agreement persuades us that the parties did not intend that Specialty would have such discretion. Moreover, Specialty fails to indicate where in the MGA or Guidelines it states that Specialty would have discretion to determine which requirements it would fulfill. While the MGA and the Guidelines state that Specialty will have authority to bind coverage, it is clear that that power was to have been exercised within the limitations of the Guidelines. The provisions of the Guidelines consistently enforce what was obviously the intent of the parties, that Spe-

cialty not bind Royal to risky applicants. It defies logic to conclude that Royal intended to permit Specialty to ignore financial indicators that provide such clear warning signs.

We also reject Specialty's contention that Royal's decision to underline the language demonstrates Royal's intent to distinguish *"should not be written"* from its use of "must" or "ineligible" elsewhere in the agreement. Specialty provides no support for this argument. When one considers the document as a whole, one is convinced that Royal's use of the underlined words *"should not be written"* was intended to emphasize to Specialty the prohibition against binding Royal when certain problems existed.

> Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact. It has long been the rule that when a contract is clear in and of itself, circumstances, extrinsic to the document may not be considered ... and that where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary to determine the legal effect of the contract.

*Oswegatchie Light & Power Co. v. Niagara Mohawk Power Corp.,* 8 Misc.2d 382, 167 N.Y.S.2d 587, 591 (N.Y.Sup.1957) (internal citations omitted) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957)).

### B.  Proximate Cause

■ In its Motion for Summary Judg-

ment,[8] Specialty claims that Royal has failed to demonstrate a connection between Specialty's alleged violation of the Guidelines and Royal's having to pay Mamma Maria's claim. Since we have addressed that argument in our related Memorandum & Order denying Specialty's Motion for Summary Judgment, we will not restate that full analysis here. Suffice it to say that based upon the language in the MGA, it is clear that Royal has demonstrated the requisite causation. The MGA specifically states:

> AGENCY shall indemnify and hold harmless Royal ... from and against any loss, cost, claim, expense, damage, liability, penalty, fine, punitive or exemplary damages ... or expense (including reasonable outside attorney's fees) incurred, *arising out of or in connection with or resulting directly or indirectly* from the following:
>
> a. A breach by Agency or any subproducer of Agency of any term or condition of this agreement, and/or
>
> b. Any error, omission or negligent act performed by Agency, its agent's servants, employees and service companies utilized by the Agency.

(MGA at ¶ 12, Ex. A to Royal's Mot. for Summ. J. in 99–cv–3689 (emphasis added)). The MGA indicates that Specialty will hold Royal harmless for any loss, costs, claim, liability, or expenses, including attorney's fees, associated with a breach. It does not require that Royal demonstrate that the breach was the but-for cause of the damages. In fact, the language clearly indicates that a mere indirect connection will suffice. We reject Specialty's assertion that there is no causation between the breach of the agreement and the damages that Royal had to pay to Mamma Maria. The parties entered into this agreement with the understanding that financially unstable businesses are at a higher risk for submitting claims. It is only logical that the parties intended that Specialty would be responsible for the damages which Royal had to pay that resulted directly from business written by Specialty in violation of its obligation to conduct a proper financial status investigation.

### C. Damages

The indemnification clause in the MGA specifically provides what damages Specialty is obligated to pay in the event of a breach. Royal claims that it is entitled to indemnification for the loss suffered on the Mamma Maria claim plus attorney's fees and costs. This is exactly what the MGA provides.

## IV. CONCLUSION

For the foregoing reasons, we will grant Royal Indemnity Company's Motion for Summary Judgment on its Complaint in Civil Action No. 99–3689, as it relates to the breach of contract claim in Count I of Royal's Complaint. We will also dismiss Royal's negligence claim in Count II of the Complaint.

An appropriate Order follows.

### *ORDER*

AND NOW, this ____ day of July, 2004, upon consideration of Royal Indemnity Company's Motion for Summary Judgment on its Complaint in Civil Action No. 99–3689, (Royal Indemnity Company's

---

8. In response to Royal's present Motion for Summary Judgment, Specialty drafted a letter, providing limited analysis and indicating that its Motion for Summary Judgment in the instant case would serve as its response to Royal's present Motion for Summary Judgment.

First Motion for Summary Judgment, Doc. No. 36 in 99–cv–3689), and all papers filed in support thereof and opposition thereto, it is ORDERED as follows:

1.  Royal's Motion is GRANTED as to Count I—Breach of Contract; and

2.  Count II of Royal's Complaint entitled "Negligence" is DISMISSED.

IT IS SO ORDERED.