Dye, J.
On or about July 30, 1948 the plaintiff, hereinafter called Bethlehem, entered into a subcontract with the defendant Turner Construction Company, hereinafter called Turner, to furnish, deliver and erect the structural steel for a 20-story office building on Broadway between 55th and 56th Streets, New York City, which Turner — as general contractor — was to build for the defendant Mutual Life Insurance Company of New York, hereinafter called Mutual, for a fixed fee, Mutual to pay for all other costs. The contract contained a clause providing that in the event the “prices for component materials ” increased or decreased, there was to be a corresponding adjustment of the contract prices. Adjustment for increases in the price of steel in any event was limited to $15 per ton.
Pursuant to such provision, Bethlehem rendered periodic bills for materials furnished, which Mutual paid without complaint in respect to items other than the escalation portion of the price, asserting that the term “ prices for component materials ” as used in the contract had reference to changes in price to Bethlehem for materials it used in progressing the work, that is, if there were increases in the prices paid by Bethlehem in order to obtain the materials necessary to produce steel — which is to say — the cost to Bethlehem in the manufacture of raw steel at the mill, based on the basic elements employed such as iron ore, steel scrap, limestone, etc. Bethlehem refused to accept such an interpretation and insisted that the words ‘ ‘ prices for component materials ’ ’ included the price of steel being regularly charged to the trade which, in this instance, had been increased by $10 per ton for the aggregate of steel items known as steel shapes, plates, bars, sheets, rivets and bolts. Based on this contention, Bethlehem rendered bills aggregating $94,861.15. When Turner and Mutual persisted in their refusal to pay, Bethlehem filed a mechanic’s lien against Mutual’s building and brought this *459 action for its foreclosure. When issue was joined, Bethlehem moved for summary judgment on the question of Turner’s liability to Bethlehem and Bethlehem’s right to enforce its lien against the property of Mutual and for an assessment of the amount due. Special Term, although “persuaded by the interpretation given to the words in question by the plaintiff ”, was nonetheless constrained to deny the motion on the ground that an issue of fact was presented. On appeal to the Appellate Division, that court reversed the Special Term, granted summary judgment in favor of plaintiff and directed an assessment of the amount due.
The basic issue, then, is the meaning of the term “ prices for component materials ”, as used in the price adjustment clause of the contract.
A trial is warranted only in the event that we deem the words ambiguous. No such problem faces us here. Bethlehem agreed to furnish, deliver, erect and paint all structural steel work in accordance with Class A material, A.I.S.C. Code of Standard Practice. Turner was to pay $182 per net ton (2,000 pounds) for the steel, subject to the price adjustment clause in the event of increase or decrease in price. That clause made specific mention of the basis for computing the changes in steel price, viz., designing, fabrication and erection which, by the description, quite obviously has reference to the steel delivered and used on the job. The maximum increase was not to exceed $15 a ton. The increase billed was calculated on the basis of the increase of $10 per ton, which was a publicly quoted uniform price increase charged by Bethlehem to all other purchasers of steel from the mill. It appears without denial that Bethlehem increased the price of steel after the contract although the price increase was in effect before the contract was executed. As matter of undisputed fact, the parties had expressly agreed that the escalation clause was to be effective as of June 28,1948. In support of their contention, appellants point to the testimony of Mr. HugheS, the controller of Mutual, that he understood the escalation clause to have that meaning. Such a view impresses us as straining the contract language beyond its reasonable and ordinary meaning. If “ component materials ” mean raw materials used in the production of steel, escalation on account of labor rates would not be limited to those specifically mentioned in connection with design, fabrication and erec *460 tion., but would have included labor costs at tbe mill as well. However, it does not. The formula employed referred to the computation of ‘1 prices for component materials, labor rates applicable to the fabrication and erection thereof and freight rates ”. A normal and reasonable meaning of that clause has the word “thereof” referring to the term “component materials ” so that component materials signify the materials that Bethlehem contracted to provide in performing the work “furnishing, delivering, erecting and painting all structural steel work in accordance with Class ‘ A ’ material A.I.S.C. Code of Standard Practice ”, etc. Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact. It has long been the rule that when a contract is clear in and of itself, circumstances extrinsic to the document may not be considered (General Phoenix Corp. v. Cabot, 300 N. Y. 87) and that where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary to determine the legal effect of the contract (Brainard v. New York Central R. R. Co., 242 N. Y. 125; Matter of Western Union Tel. Co. [American Communications Assn.], 299 N. Y. 177).
Appellants argue that unless the escalation clause has the meaning attributed to it by them, Bethlehem has an arbitrary unilateral power to change the price terms of the Bethlehem-Turner contract. In other words, appellants are saying that the contract lacks requisite mutuality and that an escalation clause, in order to be valid, must be based on some extrinsic standard by which escalation can be determined. However, this escalation clause provided for increases or decreases in accordance with changes in Bethlehem’s regular prices to all purchasers of plain steel products and such a provision does not give Bethlehem undue power of determination of the contract price (Buggs v. Ford Motor Co., 113 F. 2d 618; Ken-Rad Corp. v. R. C. Bohannan, Inc., 80 P. 2d 251). The Referee found that Bethlehem in fact charged uniform and regular prices to all purchasers of its plain steel products including its own fabrication and erection division and such a finding is *461 supported by substantial evidence. This finding -was unanimously affirmed by the Appellate Division and may not be disturbed by us (Civ. Prac. Act, § 605).
Finally, as a second main point, appellants argue that Bethlehem is not entitled to the claimed price escalation, even under Bethlehem’s interpretation of the contract, because it failed to establish that uniform prices were charged by it for structural steel products. The appellants’ position on this point is based upon evidence from Bethlehem’s records relating to contracts between Bethlehem and others for a variety of jobs involving fabrication and erection. But reliance on this evidence confuses the “ contract price ” for the job with the “ prices for component materials ”. Certainly the distinction is obvious between a contract price which is a competitively bargained price for a job and includes fabrication and erection as well as the furnishing of plain steel products and, on the other hand, the prices of component materials which are the prices for the structural steel products such as pipes, plates, bars, rivets, nuts and bolts.
The judgment appealed from should be affirmed, with costs.