**Miriam B. ANDREWS et al., Plaintiffs-Appellees,**

**v.**

**DEERING MILLIKEN, INC., Defendant-Appellant.**

**No. 17179.**

United States Court of Appeals
Sixth Circuit.

Oct. 5, 1967.

---

Dwight B. Buss, Cleveland, Ohio, for appellant, Baker, Hostetler & Patterson, Cleveland, Ohio, Andrew L. Hughes, Townley, Updike, Carter & Rodgers, Gerald A. McCarville, New York City, on brief.

Victor DeMarco, Cleveland, Ohio, for appellees, Robert H. Trenkamp, Malcolm C. Douglas, Trenkamp, Brown & Douglas, David L. Foster, Jones, Day, Cockley & Reavis, Cleveland, Ohio, on brief.

Before WEICK, Chief Judge, and O'SULLIVAN and PHILLIPS, Circuit Judges.

WEICK, Chief Judge.

The controversy here is over the interpretation of the provisions of an agreement covering research and commercial exploitation of plaintiff H. J. Rand's improvements in heat-reflective textiles with low heat emissivity, as well as processes, machines and equipment for producing them.

The case originated in the Common Pleas Court of Cuyahoga County, Ohio, and was an action for a declaratory judgment with respect to the rights and liabilities of the parties under the agreement, and for an accounting. It was removed to the District Court on the ground of diversity of citizenship, and was tried without a jury. The District Court adopted findings of fact and conclusions of law and rendered judgment in favor of plaintiffs in the amount of $143,505.00, with interest. The defendant, Deering Milliken, Inc. (hereinafter referred to as Deering Milliken) has appealed from said judgment to this Court.

Since 1932 the plaintiff, H. J. Rand, had been engaged in research and development. In 1949 he began the study of achieving warm fabrics with minimum weight, and after considerable research found that fabric, thinly coated with

aluminum flakes, possessed desirable heat retaining characteristics.

Rand needed funds to finance additional research and to promote the product after it was perfected. At the suggestion of a Cleveland clothing manufacturer, officers of Deering Milliken were contacted for this purpose, and Rand and others met with representatives of Deering Milliken in New York on June 21, 1949, at which meeting there were discussions with respect to development and marketing of his concept. These discussions included Deering Milliken's undertaking to finance further development of Rand's concept to the extent of $50,000, its promotion of the resulting product the obtaining of patents and trademarks, and compensation to Rand on a profit sharing rather than a patent royalty basis.

After the New York meeting, a letter agreement and an accompanying letter, both dated June 27, 1949, were sent by Roger Milliken, an officer of Deering Milliken, to Rand, and the letter agreement was executed by Rand. Although there was some dispute in the testimony concerning patents and the conditions under which the letter agreement was executed, a final written agreement, dated March 21, 1950, was entered into by the parties, which "amplified and modified" the letter agreement[1]. The rights and liabilities of the parties must therefore be determined from the provisions of the final agreement.

The agreement provided compensation to Rand in an amount equal to twenty-five per cent of the net profits of Deering Milliken after it had recouped from profits the amount of its advances for research and other expenses.

Rand continued with the research and development of his concept and was reimbursed by Deering Milliken for the actual cost which exceeded $250,000. He obtained two United States patents Nos. 2,630,573 and 2,630,620, on the product and a number of additional patents in foreign countries, all of which were assigned to Deering Milliken. The parties agreed upon the trademark "Milium", which was first used on April 20, 1950, and was registered by Deering Milliken in the United States Patent Office.

Deering Milliken licensed the patents and trademark to converters and processors[2] and collected royalties under the licensing agreements. It advertised and promoted the product and the trademark extensively. The advertising and promotional expenses were taken into account in computing Deering Milliken's net profits, from which Rand's twenty-five per cent was computed, and Rand thus paid his proportionate share.

The undertaking proved to be highly successful and profitable to both parties. By 1955 Deering Milliken had recovered from profits all sums which it had advanced to finance development and research and other sums deductible under the provisions of the agreement. It then began to make payments to Rand. During the years prior to fiscal year 1960 the income of Deering Milliken from patent and trademark licenses, after deducting business expense and development costs, aggregated approximately $2,500,000, of which Rand received as his share about $628,000. In its accounting to Rand, Deering Milliken made no allocation between patent and trademark income.

An action was commenced by Deering Milliken in the District Court for the Southern District of New York, to restrain infringement of Rand's two United States patents by third parties. The District Court held that the patents were valid and infringed (Deering Milliken & Co. v. Tempo-Resisto Corporation, 160 F. Supp. 463), but on appeal the Court of Appeals for the Second Circuit reversed and held that the patents were invalid

---

1. The plaintiffs and defendant are the successors in interest to the original parties to the agreement.

2. Appellant defined converters as "those owning cloth to be coated by processors", and processors as "those applying the coatings pursuant to the Rand patents later granted."

(274 F.2d 626 (decided January 22, 1960)). Certiorari was not applied for and the judgment became final.

Subsequent to this decision, Deering Milliken executed new license agreements with the converters and processors, licensing only the trademark Milium.

■ From 1960 through 1964, Deering Milliken's net income from domestic and foreign licensing amounted to $694,-504. It took the position that Rand was not entitled to participate in the net profit from licensing the Milium trademark, and has refused to account therefor. The only question in the case is whether compensation to Rand arising from the trademark licenses was excluded from the agreement.

From the beginning of the relationship, it was understood that trademarks or trade names might be developed in connection with the exploitation of Rand's concept, to identify the product, and that they might be of considerable commercial value. It was mentioned in Milliken's accompanying letter of June 27, 1950. The name Milium was agreed upon. The trademark, along with the patents, was licensed to all the converters and processors. Large sums of money were spent by Deering Milliken in advertising and promoting the product and trademark, and Rand's share of these expenses was deducted from his compensation.

Since the Second Circuit Court decision, Deering Milliken's licensed processors and converters have been making or selling the product under the trademark and name Milium. Deering Milliken has received net profits from this operation for which it has refused to account to Rand for his share.

The final agreement contains broad provisions of coverage. In Section 1 it provides:

"Rand hereby conveys or will cause to be conveyed to Vadium [3] all discoveries and inventions (whether or not patentable) conceived or first actually reduced to practice * * *."

Section 3 defines what income is covered by the agreement. It provides:

"A. The gross income of Vadium shall consist of all license fees, royalties and other amounts (from all sources whatsoever) actually collected by Vadium, during the fiscal year; * * *"

It is not disputed that the plain language of Section 3 is sufficiently broad to include royalties from trademark licensing. The only question then is whether subsequent sections of the agreement exclude such royalties.

Section 10 is the only section of the agreement dealing with the consequences attendant upon a court decision holding patents to be invalid. In material part it provides:

"In the event that (i) any United States Letters Patent on any application covering any of the inventions or discoveries of Rand pursuant to Section 1 hereof, or acquired by Vadium upon the recommendation of or with the consent of Rand pursuant to Section 11 hereof, is held invalid either wholly or in part by a court of competent jurisdiction whose decision is final or by an inferior court from whose judgment no appeal is taken; or (ii) any non-patented or non-patentable secret process developed or acquired pursuant to said sections becomes a matter of competitive knowledge in the trade or industry, then Vadium shall not be obligated to pay Rand pursuant to Section 3 hereof with respect to any license fees or royalties received and pertaining solely to (a) the patent or claims therein so held invalid, or (b) the process so becoming a matter of competitive knowledge; provided, however, that Vadium shall continue to make such payments in either of such events if the process, machines, or equipment covered by such patent or said claims or the theretofore-secret process is not being commercially 'sold, licensed or exploited by others on a competitive basis' with Vadium and/or

---

3. Vadium was Deering Milliken's subsidiary and predecessor party to the agreement.

its licensees, and, provided further, that nothing herein contained shall require Vadium to collect or remit license fees or royalties on any invalidated patent."

It will be noted that by the express language of Section 10, Deering Milliken was relieved of paying Rand under Section 3 only "with respect to any license fees or royalties received and pertaining solely to (a) the patent or claims therein so held invalid". Since the Second Circuit Court decision, Deering Milliken has collected no licensee fees or royalties with respect to either of the invalid patents and Rand has made no claim with respect thereto. He claims only his share of the net profits arising from the licensing of the trademark.

Nowhere in the exclusion clause is the word "trademark" mentioned. We have no right to read an additional exclusion into it. Furthermore, this case does not involve license fees or royalties with respect to a non-patented or secret process, but only royalties on a valid trademark.

It is therefore clear to us that license fees and royalties received from licensing the trademark were not excludable under Section 10.

Deering Milliken further contends that the agreement is ambiguous, and sought to introduce oral testimony in the District Court designed to prove that it (Deering Milliken) intended to bargain for the exclusivity of patent protection; that competition has substantially increased since the patents were held invalid and its profits have been greatly reduced; that when the two United States patents were declared invalid there was a failure of consideration and an eviction resulted, relying on Drackett Chemical Co. v. Chamberlain Co., 63 F.2d 853 (6th Cir. 1933).[4] Specifically it wants the Court to insert the word "product" before the word "process" in the fourth line of subsection (b) of Section 10.

■ We cannot do this because we agree with the District Court that there is no ambiguity in the agreement. The agreement was not drawn by novices, but was prepared by experienced and capable patent attorneys representing both parties, after negotiations extending over a period of about two months and involving at least five different drafts. We must assume that this carefully prepared document, written in clear and plain language, means what it says and accurately expresses the intent of the parties.

■ The law of New York, which governs this case because of contractual provision, conforms to the general rule that does not permit the introduction of oral testimony to vary or contradict the terms of a written contract to which both parties have assented as the complete and accurate integration of their agreement. Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 460, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957); Laskey v. Rubel Corp., 303 N.Y. 69, 71, 100 N.E.2d 140 (1951); 3 Corbin, Contracts § 573 at page 357 (1960 ed.); Restatement, Contracts § 237 (1932); 4 Williston, Contracts § 631 at page 955 (3d ed.).

■ It is not permissible to resort to extrinsic evidence as to one party's claimed intent. Wilson Sullivan Co. v. International Paper Makers Realty Corp., 307 N.Y. 20, 25, 119 N.E.2d 573 (1954); Mencher v. Weiss, 306 N.Y. 1, 7, 114 N.E.2d 177 (1953).

Reliance upon *Drackett* is misplaced. Rand does not seek royalties from invalidated patents, but only his share of the net income received by Deering Milliken from licenses on a valid trademark, but for which income it has refused to account.

Nor do we think that Section 11, which relates to the purchase of patents from third parties, throws any light on the construction of Section 10.

In our opinion the findings of fact adopted by the District Judge are not clearly erroneous. His conclusions of law are correct.

Affirmed.

4. Deering Milliken still collects royalties on foreign patents and sales, for which it is accounting to Rand.