[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-11052

_____

D. C. Docket No. 04-02208-CV-RWS-1

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 1, 2006
THOMAS K. KAHN
CLERK

BRIDGE CAPITAL INVESTORS, II,

Plaintiff-Counter-
Defendant-Appellee,

versus

SUSQUEHANNA RADIO CORPORATION,

Defendant-Counter-
Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 1, 2006)**

Before BLACK, BARKETT and COX, Circuit Judges.

BLACK, Circuit Judge:

Appellant Susquehanna Radio Corporation (Susquehanna) appeals the district court's grant of summary judgment to Appellee Bridge Capital Investors, II (BCI) in this breach of contract action. Specifically, Susquehanna contends the district court erred when it held Susquehanna's Construction Permit unambiguously became a "Final Order"—as defined in Section 5.4(d) of the parties' Asset Purchase Agreement (the Agreement)—before May 23, 2003, thus requiring Susquehanna to pay BCI the $10 million additional payment set forth in Section 2.4.[1] We affirm.

## I. BACKGROUND

The Federal Communications Commission (FCC) has a standard, two-step procedure for relocating an existing FM radio station to a new community. First, the station's licensee must obtain an FCC Report and Order (Reallotment R&O), which amends the Table of Allotments to allow the station to broadcast from a new community of license. If the FCC issues such a Reallotment R&O, the licensee must then secure a Construction Permit (CP) to build broadcast facilities at the new location. In summary, the licensee must obtain two separate FCC

---

[1] Susquehanna also contends the district court should have granted it summary judgment under the equitable doctrine of judicial estoppel. After reviewing the parties' briefs, the record, and the relevant case law, we conclude the district court did not abuse its discretion when it rejected Susquehanna's judicial estoppel claim. *See Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1284 (11th Cir. 2002) (applying the abuse of discretion standard of review to the district court's application of judicial estoppel).

orders to relocate its existing FM radio station: (1) the Reallotment R&O and (2) the CP.

On November 6, 1996, Susquehanna agreed to purchase the assets of two Anniston, Alabama, radio stations (collectively the Station) from Sapphire Broadcasting, Inc. (Sapphire) for $15.05 million. Seeking to relocate the Station to the more lucrative Atlanta-area market of College Park, Georgia, Susquehanna agreed to pay Sapphire an additional $10 million upon satisfaction of three conditions. These three conditions—each of which pertains solely to the CP—appear in Section 2.4 of the Agreement:[2] (1) the FCC grants Susquehanna a Class C-3 CP without any "material adverse conditions," as defined in Section 2.4; (2) the CP meets Susquehanna's Atlanta-area broadcast coverage requirements; and (3) Susquehanna "obtains the Final Order for a CP" within six years of the

---

[2] Section 2.4 provides (emphasis added):

> 2.4 Additional Payment. In the event the [FCC] grants a *Construction Permit ("CP")* without any "material adverse conditions" (as hereinafter defined in this Section 2.4) to WHMA-FM for a location that will provide coverage substantially similar in population, square miles and location to that shown on Schedule 2.4, which *CP* grant has become a Final Order (as defined in Section 5.4(d)), Buyer will pay to Seller, upon program test authority or six (6) months from the date the *CP* grant has become a Final Order, whichever occurs sooner, an amount, in addition to the amount set forth in Section 2.1, as follows:
>
> . . .
>
> > (c) If the *CP* is for a Class C-3 facility or below, the amount will be Ten Million Dollars ($10,000,000).
>
> Additional consideration as set forth in [subsection (c)] above shall only be due and owing by Buyer to Seller if Buyer obtains the Final Order for a *CP* within six (6) years of the Closing Date.

3

Agreement's May 22, 1997, closing date (i.e., before May 23, 2003).  Section

5.4(d) defines the term "Final Order":

> The term "Final Order" shall mean an FCC order which is not reversed, stayed, enjoined, set aside, annulled or suspended and with respect to which no timely filed request for administrative or judicial review, reconsideration or stay is pending, and as to which the time for filing any such request, or for the FCC to set aside its order on its own motion, has expired.

After receiving the $15.05 million initial payment for the Station from

Susquehanna, Sapphire assigned to BCI its rights to the $10 million additional

payment.

Susquehanna filed a Petition for Rule Making with the FCC on

November 6, 1997, requesting a Reallotment R&O that would enable it to relocate

the Station from Anniston to College Park.  Preston W. Small then submitted a

competing proposal to move his Midgeville, Georgia, station to Social Circle,

Georgia.  If granted, Small's counterproposal would have prevented Susquehanna

from moving the Station to College Park.  On April 28, 2000, the FCC granted

Susquehanna's petition and denied Small's counterproposal by means of a

Reallotment R&O.

Between June 16, 2000, and August 19, 2002, Small filed multiple petitions

for reconsideration of the Reallotment R&O and motions to reopen the record.

The FCC denied each petition and motion. On January 22, 2004, the FCC also precluded Small from filing further requests for administrative relief or rehearing. Small then sought review of the Reallotment R&O in the U.S. Court of Appeals for the D.C. Circuit, but the court denied his petition for review on May 19, 2005, and denied his request for rehearing en banc on July 26, 2005. *See Small v. FCC*, 161 F. App'x 11, 12 (D.C. Cir. 2005).

On November 14, 2000, while Small's first petition for reconsideration of the Reallotment R&O was pending, the FCC granted Susquehanna its requested Class-3 CP. In accordance with Section 2.4, this CP did not contain any "material adverse conditions" and satisfied Susquehanna's Atlanta-area broadcast coverage requirements. Susquehanna proceeded to construct its broadcast facilities in College Park and received FCC program test authority to begin broadcasting the Station. Since January 2001, the Station has continuously broadcast from College Park as "All the Hits Q100." Nevertheless, when BCI requested the $10 million additional payment from Susquehanna, Susquehanna asserted its CP did not become a "Final Order" before May 23, 2003, as required under Section 2.4, and thus refused payment.

BCI filed suit on June 29, 2004, alleging Susquehanna's CP became a "Final Order" before May 23, 2003, and, therefore, Susquehanna's refusal to make

5

the $10 million additional payment constituted a breach of contract. Both parties moved for summary judgment. On January 26, 2005, the district court determined Susquehanna's CP became a "Final Order" prior to May 23, 2003, and BCI was thus entitled to summary judgment on its breach of contract claim. The district court accordingly awarded BCI $10 million plus interest and attorney's fees and costs. This appeal ensued.

## II. STANDARD OF REVIEW

"We review *de novo* the district court's grant of summary judgment, applying the same legal standards as the district court, and viewing all facts and reasonable inferences drawn therefrom in the light most favorable to . . . the non-moving party." *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

## III. DISCUSSION

This appeal presents the following question of contract interpretation: Did Susquehanna's CP unambiguously become a "Final Order"—as defined in Section 5.4(d) of the Agreement—before May 23, 2003? To answer this question, we must look first to Section 15.8, which instructs us to construe the Agreement in accordance with New York law. Under New York law, "[w]hether a contract is clear or ambiguous is for the court to determine as a matter of law." *Fetner v.*

*Fetner*, 741 N.Y.S.2d 256, 258 (N.Y. App. Div. 2002). "[W]here the contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument," *id.*, and "the case is ripe for summary judgment," *Am. Express Bank, Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990).

With these basic rules of contract interpretation in mind, we begin our analysis of the Agreement's relevant language. Again, Section 2.4 stipulates the $10 million additional payment "shall only be due and owing by [Susquehanna] to [BCI] if [Susquehanna] *obtains the Final Order for a CP*" before May 23, 2003. As explained above, the Reallotment R&O and the CP are separately issued FCC orders. Accordingly, the parties could have made the additional payment due and owing upon, among other events, Susquehanna's acquisition of (1) the "Final Order" for a Reallotment R&O; (2) the "Final Order" for a CP; or (3) the "Final Order" for both a Reallotment R&O and a CP. The language of Section 2.4 unambiguously indicates the parties opted for the second option and made the additional payment due and owing only upon Susquehanna's acquisition of "the Final Order for a CP."

We now turn to Section 5.4(d) to determine whether the CP became a "Final Order" before May 23, 2003. Section 5.4(d) sets forth three requirements for the CP to qualify as a "Final Order":

(1) the CP has never been "reversed, stayed, enjoined, set aside, annulled or suspended";

(2) "no timely filed request for administrative or judicial review, reconsideration or stay is pending" "with respect to" the CP; and

(3) (a) "the time for filing any such request [for administrative or judicial review, reconsideration or stay of the CP] . . . has expired," and

(b) "the time . . . for the FCC to set aside [the CP] on its own motion . . . has expired."

After reviewing the parties' briefs, the record, and the relevant statutes, regulations, and case law, we conclude each of these three requirements was satisfied before May 23, 2003. First, the CP was never "reversed, stayed, enjoined, set aside, annulled or suspended." Second, the Secretary of the FCC, Marlene H. Dortch, certified that "no request for administrative or judicial review, reconsideration or stay has been filed with respect to [the CP]." Third, the "time for filing any such request [for administrative or judicial review, reconsideration or stay of the CP]" expired on December 17, 2000 (i.e., 30 days after the FCC

8

issued public notice of the CP on November 17, 2000), *see* 47 U.S.C. §§ 402(b)–(c), 405(a), and the "time for . . . the FCC to set aside [the CP] on its own motion" expired on December 27, 2000 (i.e., 40 days after the FCC issued public notice of its grant of the CP on November 17, 2000), *see* 47 C.F.R. § 1.117. In short, the CP became a "Final Order," as defined in Section 5.4(d), no later than December 27, 2000—nearly two and a half years *before* the Agreement's six-year deadline. Accordingly, we hold Sections 2.4 and 5.4(d) unambiguously obligate Susquehanna to pay BCI an additional $10 million.

Seeking to make an end-run around the Agreement's unambiguous language, Susquehanna argues Section 5.4(d)'s second requirement—i.e., "no timely filed request for administrative or judicial review . . . is pending" "with respect to" the CP—was not satisfied before May 23, 2003. Specifically, Susquehanna asserts Small's multiple requests for administrative and judicial review of the Reallotment R&O constituted "timely filed requests for administrative or judicial review" with respect to the CP. Because these requests for administrative and judicial review of the Reallotment R&O were "pending" between June 16, 2000, and July 26, 2005, Susquehanna thus contends the CP did

9

not become a "Final Order" until July 26, 2005—over two years *after* the

Agreement's six-year deadline.[3]

The gravamen of Susquehanna's argument is that we should judicially

rewrite Sections 2.4 and 5.4(d) to make the additional payment due and owing

upon the Reallotment R&O *and* the CP becoming "Final Orders" before May 23,

2003. When contracting parties express their intent in unambiguous language,

however, "words cannot be read into [the] contract which import an intent wholly

---

[3] The dissent devotes Part A of her opinion to analyzing the latter portion of Section 5.4(d)'s *third* requirement—i.e., "the time . . . for the FCC to set aside [the CP] on its own motion . . . has expired." Based on this analysis, the dissent concludes the CP "could not have become a 'Final Order' until forty days after the judicial review of the Reallotment R&O . . . terminated" on July 26, 2005. Dissenting Op. at 20.

Yet, in its district court briefs, Susquehanna never addressed Section 5.4(d)'s third requirement; instead, it based its argument solely on Section 5.4(d)'s second requirement. Most importantly, Susquehanna expressly addressed the second requirement's language, asserting (1) the Reallotment R&O "was subject to pending administrative review as of May 22, 2003," (2) "the FCC's continued review of [the Reallotment R&O] constitute[d] review of the CP," and, (3) "[a]ccordingly, on May 22, 2003, the CP was subject to administrative review and was not a 'Final Order.'" In contrast, Susquehanna either failed or declined to provide any analysis of the third requirement's language. Furthermore, each time Susquehanna quoted Section 5.4(d) in its district court briefs, it bolded the language of the second requirement; it did not, however, bold the language of third requirement. This selective textual emphasis highlighted for the district court that Susquehanna focused its argument exclusively on Section 5.4(d)'s second requirement.

Susquehanna therefore never presented the district court with the third-requirement-related argument the dissent raises in Part A of her opinion. Under our circuit's case law, we thus deem waived any argument Susquehanna may have had as to Section 5.4(d)'s third requirement. *See, e.g.*, *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr S.A.*, 377 F.3d 1164, 1170 (11th Cir. 2004) ("To be clear, it is not our position that [appellant] waived its argument because it did not *sufficiently* raise it below; rather, . . . [we] conclude that [appellant] did not previously raise the issue *at all*. Therefore, we decline to address it for the first time on appeal."); *Chapman v. AI Transp.*, 229 F.3d 1012, 1044 (11th Cir. 2000) ("It is axiomatic that an argument not raised before the trial court . . . has been waived.").

unexpressed when the contract was executed." *In re Rivas' Trust*, 100 N.Y.S.2d 357, 365 (N.Y. Sup. Ct. 1950) (quotation omitted). The parties did not refer to the Reallotment R&O in Sections 2.4 and 5.4(d); instead, they unambiguously agreed to make the $10 million additional payment contingent upon the CP—and the CP alone—becoming a "Final Order," as defined in Section 5.4(d), before May 23, 2003. If Susquehanna genuinely intended to link the additional payment to the Reallotment R&O's finality, it should have exercised greater care in negotiating the language employed in Sections 2.4 and 5.4(d).[4]

---

[4] To support its argument about Section 5.4(d)'s second requirement, Susquehanna points in part to Paragraph 7 of the CP, which provides:

> The grant of this permit is conditioned on the final outcome of [Small's Petition for Reconsideration of the Reallotment R&O]. The final outcome of that proceeding may require WHMA-FM to change frequency, class, or site location. Accordingly, any construction undertaken pursuant to this permit is at the permittee's sole risk. See Meridian Communications, 2 FCC Rcd 5904 (Rev. Bd. 1087).

According to Susquehanna, this conditional language indicates the FCC considered Small's challenges to the Reallotment R&O as challenges to the CP as well, and, therefore, the CP could not become a "Final Order" until the Reallotment R&O became a "Final Order."

This argument lacks merit for at least two reasons. First, Paragraph 7 merely reiterates a fact known to both parties at the time of contracting—i.e., if the FCC granted Susquehanna a Reallotment R&O and a CP, but then revoked the Reallotment R&O, Susquehanna's CP alone would not enable it to broadcast the Station from College Park. As we suggest above, Susquehanna could have avoided this well-known risk by making the $10 million additional payment expressly contingent upon both the Reallotment R&O and the CP becoming "Final Orders." It either failed or declined to do so, however, and we may not "make a new contract for the parties under the guise of interpreting the writing." *See Vt. Teddy Bear Co. v. 538 Madison Realty* Co., 1 N.Y.3d 470, 475 (N.Y. 2004) (quotation omitted). Second, the FCC's certification that "no request for administrative or judicial review, reconsideration or stay has been filed *with respect to [the CP]*" indicates the FCC did not consider Small's challenges to the Reallotment R&O as challenges to the CP as well.

11

Furthermore, Susquehanna fails to direct our attention to a single pre-Agreement statute, regulation, or FCC case indicating that a CP can only become a "Final Order" if the related Reallotment R&O becomes a "Final Order." If such authority existed, we could arguably read the words "Reallotment R&O" into Sections 2.4 and 5.4(d), because, "unless a contract provides otherwise, the law in force at the time the agreement is entered into becomes as much a part of the agreement as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made." *Dolman v. U.S. Trust Co. of N.Y.*, 138 N.E.2d 784, 787 (N.Y. 1956). Susquehanna accordingly cites three FCC cases—*In re Meridian Communications*, 2 F.C.C.R. 5904 (1987); *In re Open Media Corp.*, 8 F.C.C.R. 4070 (1993); and *In re KWQJ(FM), Anchorage, Alaska*, 10 F.C.C.R. 8774 (1995)—for the proposition that FCC case law, in force when the parties contracted, defines "Final Order" as "a [CP] that is not subject to FCC or judicial review in the underlying [Reallotment R&O] proceeding."

This argument is unavailing, however, because the facts in these three cases are not, as Susquehanna asserts, "indistinguishable from the facts in this case." Indeed, none of these three cases involved a Reallotment R&O. Rather, in each case, (1) Applicant A and Applicant B submitted mutually exclusive CP

12

applications to construct a new radio station; (2) the FCC dismissed Applicant A's

CP application, and Applicant A petitioned for reconsideration of this dismissal;

(3) the FCC granted Applicant B's CP application; and (4) the FCC held Applicant

B's grant could not become "final" until the FCC adjudicated Applicant A's

petition for reconsideration. *Meridian Commc'ns*, 2 F.C.C.R. at 5904; *Open

Media*, 8 F.C.C.R. at 4070, 4072; *KWQJ(FM)*, 10 F.C.C.R. at 8774–75. At best,

therefore, these three cases stand for the proposition that one applicant's

administrative or judicial challenge to the FCC's dismissal of its CP application

prevents the FCC's grant of another applicant's mutually exclusive CP from

becoming a "Final Order."

In contrast, this case stems from Susquehanna's efforts to relocate an

existing FM radio station and involves two distinct FCC orders—the Reallotment

R&O and the CP. As discussed above, neither Small nor any other person brought

an administrative or judicial challenge to the FCC's grant of Susquehanna's CP

application; instead, Small challenged only the Reallotment R&O. The three FCC

cases Susquehanna cites simply do not address whether Small's challenge to the

Reallotment R&O prevented Susquehanna's subsequent CP from becoming a

"Final Order." Susquehanna has thus failed to cite any law, in force at the time the

parties executed the Agreement, stating a CP cannot become a "Final Order" until

13

the related Reallotment R&O becomes a "Final Order."[5]  Accordingly, we cannot

"presume[] that the parties had such law in contemplation when the contract was

made," *Dolman*, 138 N.E.2d at 787, and Susquehanna's proffered interpretation of

Section 5.4(d)'s second requirement lacks merit.

Contrary to Susquehanna's suggestions, our interpretation of Sections 2.4

and 5.4(d) does not give rise to an unfair result.[6]  Since January 2001,

_____

[5] As indicated in footnote four, *supra*, the FCC cited *Meridian Communications* in
Paragraph 7 of the CP.  Perhaps, as Susquehanna seems to suggest, the FCC included this
citation because it analogized the facts of *Meridian Communications* to the facts of this case, and
concluded Small's challenge to the Reallotment R&O prevented the CP from becoming a "Final
Order."  Because the FCC did not state its reasons for citing *Meridian Communications*, we have
no way of knowing for certain.  Regardless, under *Dolman*, we must limit our analysis to "the
law in force at the time the agreement [was] entered into."  138 N.E.2d at 787.  The FCC issued
the CP roughly four years *after* the contract was signed.  Thus, even assuming the FCC expanded
*Meridian Communications*' holding by citing it in the CP, Susquehanna still fails to identify any
controlling law existing at the time of contracting.

[6] Nor is our interpretation unreasonable when considered in the context of radio-industry
transactions.  True, under our interpretation, Susquehanna assumed a certain amount of risk.  If
the CP had become a "Final Order" before May 23, 2003, but the FCC or D.C. Circuit had
overturned the Reallotment R&O, Susquehanna would have had to pay an additional $10 million,
even though it could not broadcast from College Park.  In the context of this Agreement,
however, the risk Susquehanna assumed was relatively small.  Indeed, the FCC has
acknowledged that "[o]nly a very small percentage of . . . challenges [to Reallotment R&Os] are
ultimately successful" and "the vast majority of petitions for reconsideration [of Reallotment
R&Os] are ultimately denied."  *In re Amendment of Section 1.420(f) of the Commission's Rules
Concerning Automatic Stays of Certain Allotment Orders*, 11 F.C.C.R. 9501, 9502, 9505 (1996).
   Given the apparent unlikelihood of the FCC or the D.C. Circuit overturning the
Reallotment R&O, Susquehanna knew it would significantly improve its chances of successfully
relocating the Station to College Park upon obtaining the CP.  Once Susquehanna had the CP in
hand, it could construct broadcast facilities in College Park, receive program test authority, begin
broadcasting, and, most importantly, make money.  We therefore think it reasonable to assume,
based on the unambiguous language of Sections 2.4 and 5.4(d), that the parties (1) regarded the
CP as the lynchpin of Susquehanna's efforts to relocate the Station, and, consequently, (2) made
the additional payment due upon the CP itself becoming a "Final Order."

14

Susquehanna has reaped the financial benefits of continuously broadcasting the Station throughout the Atlanta area as "All the Hits Q100." As the district court noted, therefore, Susquehanna has "realized the benefit of its bargain." BCI, on the other hand, has not yet "realized the benefit of its bargain," because Susquehanna refuses to surrender the $10 million additional payment. In short, Susquehanna has thus far managed to pay BCI an Anniston-area price for an Atlanta-area radio station. The Agreement's unambiguous language indicates the parties did not contract for such an outcome.[7]

## IV. CONCLUSION

For the foregoing reasons, we conclude Susquehanna's CP unambiguously became a "Final Order," as defined in Section 5.4(d), no later than December 27, 2000 (i.e., nearly two and a half years before Section 2.4's six-year deadline). Susquehanna's refusal to make the $10 million additional payment required under

---

[7] The dissent concludes by questioning our "methodology," asserting that this case "belongs in a different class . . . [because it] is centered on the question of ambiguity—where differences in interpretation should almost always compel the same conclusion: that the relevant language is ambiguous." Dissenting Op. at 25. We respectfully submit that the dissent's critique overlooks the well-established principle of contract interpretation that ambiguity does not exist simply because the parties urge different interpretations of a contract's terms. *See Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 460 (N.Y. 1957) ("Mere assertion by one that contract language means something to him [or her], where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact.").

Section 2.4 thus constitutes a breach of the Agreement. We accordingly affirm the district court's grant of summary judgment to BCI.

AFFIRMED.

BARKETT, Circuit Judge, dissenting:

Although the majority's interpretation of section 5.4(d) — to provide that the Construction Permit was a "Final Order" — <u>may</u> have captured the parties' intent, it is only <u>one plausible view</u> of what their contract reflects. If the contract <u>can</u> be read differently, and I submit that the majority's own opinion demonstrates that it can be, then summary judgment is inappropriate and further proceedings are necessary to determine the parties' intent.[1] The issue is not whether my reading of the contract or the majority's is <u>correct</u>; the issue is whether both are <u>plausible</u>. Because I believe that the contract admits of more than one interpretation, I dissent.

I

There is no disagreement that section 5.4(d) of the contract sets out three conditions, all of which must be satisfied for an FCC order to become a "Final Order" within the meaning of the contract between BCI and Susquehanna. The parties also concede that the first condition — that the FCC order at issue is "not

---

[1] Although the ambiguity <u>vel non</u> of contractual language is a question of law, New York, reflecting a near-universal consensus, provides that summary judgment is not appropriate in a breach-of-contract action where the relevant contractual language <u>is</u> ambiguous, <u>see, e.g.</u>, <u>W. Group Nurseries, Inc. v. Ergas</u>, 167 F.3d 1354, 1360 (11th Cir. 1999), and the ambiguity cannot be resolved on the basis of the contract alone, <u>see, e.g.</u>, <u>Japour v. Ed Ryan & Sons Agency</u>, 625 N.Y.S.2d 750, 751 (App. Div. 1995). Ambiguity in contractual language calls into question the intent of the parties, and thus puts extrinsic evidence, which must usually be considered by a jury, at issue. <u>See</u> <u>Monahan v. Comm'r</u>, 321 F.3d 1063, 1068 (11th Cir. 2003).

reversed, stayed, enjoined, set aside, annulled or suspended" — is satisfied. The questions at issue in this appeal are whether the second and third conditions are also satisfied. I submit that they are not, and address them in reverse order.

A

As here relevant, the third condition is satisfied only if "the time for . . . the FCC to set aside its order on its own motion[] has expired." Under the majority's view, that time period is exclusively governed by 47 C.F.R. § 1.117(a), which provides that "Within 40 days after public notice is given of any action taken pursuant to delegated authority, the Commission may on its own motion order the record of the proceeding before it for review."

The majority reads this regulation as a mandatory, inflexible, jurisdictional time limit, and suggests that Susquehanna has waived any argument to the contrary. I do not believe that Susquehanna has waived such an argument,[2] and

---

[2] Although the majority avers that "in its district court briefs, Susquehanna never addressed Section 5.4(d)'s third requirement," ante at 10 n.3, I find that Susquehanna's briefs are replete with references to the FCC's authority to withdraw or otherwise invalidate the CP should judicial review of the Reallotment R&O produce an adverse result, which must necessarily turn, as explained above, on the FCC's authority to vacate the CP after the forty-day period contemplated by § 1.117(a). True, Susquehanna does not cite § 1.117(a) expressly, but we have never suggested "that the absence of citation to statutory authority and precedent or the inartful wording of a brief necessarily will require us to conclude that a party has waived an argument." Four Seasons Hotels & Resorts, B.V. v. Conscorcio Barr S.A., 377 F.3d 1164, 1170 (11th Cir. 2004). To the contrary, BCI's reading of § 1.117(a) in its Response Brief, which the majority today adopts, clearly indicates that the Appellees received more than adequate notice of Susquehanna's argument, and that it was therefore not waived.

18

instead conclude that the FCC must have possessed the authority to set aside the Construction Permit if the Reallotment R&O was invalidated by the D.C. Circuit, as I explain more fully below. See post at 4. Moreover, neither the majority nor BCI cite to any statute, regulation or FCC case holding that the FCC may only rescind its orders pursuant to § 1.117. That is, the majority provides no explanation for why the review contemplated by § 1.117 is exhaustive, a conclusion that hardly follows from the regulation's own language, and that is inapposite here in light of the specific permit at issue.

Under the majority's view, § 1.117(a) gave the FCC only forty days from the issuance of the Construction Permit to rescind it sua sponte. Yet, the Construction Permit contemplated the possibility of future invalidation pursuant to court order whenever the judicial review of the Reallotment R&O was completed. Indeed, the FCC would have had to rescind the Construction Permit had the D.C. Circuit invalidated the Reallottment R&O. Thus, the if the majority's reading of § 1.117(a) is correct, the FCC would have lacked the authority, after forty days, to do what the Construction Permit contemplated and what the law would have required.[3]

---

[3] As it turns out, the review of the Reallotment R&O was not completed until at least July 26, 2005, when the U.S. Court of Appeals for the D.C. Circuit, after denying the petition for

(continued...)

Indeed, the majority even notes the potential absurdity that would follow from their "unambiguous" interpretation of the contract. To wit: "If the CP had become a 'Final Order' before May 23, 2003, but the FCC or D.C. Circuit had overturned the Reallotment R&O, Susquehanna would have had to pay an additional $10 million, even though it could not broadcast from College Park." Ante at 14 n.6. The majority nevertheless justifies such an implausible reading of the contract by asserting that, "[i]n the context of this Agreement, . . . the risk Susquehanna assumed was relatively small," because it was unlikely that the review of the Reallotment R&O would succeed. This conclusion flies in the face of the majority's acknowledgment of both the possible risk, albeit small, and its acknowledgment of the fact that some challenges do succeed. Had the challenge succeeded in this case, would § 1.117(a) really bar the FCC from complying with the D.C. Circuit's judgment? If not, then § 1.117(a) doesn't mean what the majority says it means.

Even if it were true that the challenge to the Reallotment R&O was likely to fail (and I am hard-pressed to see how we can interject such post-hoc

_____

³(...continued)
review of the Reallotment R&O, see Small v. FCC, 161 F. App'x 11 (D.C. Cir. 2005), denied rehearing en banc. By then, nearly five years had elapsed since the Construction Permit had been issued.

rationalization into contract interpretation), such a result hardly amplifies the extent to which the contract is <u>unambiguous</u> along the lines suggested by the majority. Quite to the contrary, it only bolsters the argument that the Construction Permit could not have become a "Final Order" until forty days after the judicial review of the <u>Reallotment R&O</u> had terminated, and I would so interpret the third condition. At the very least, it cannot be gainsaid that the Construction Permit's language renders the third condition of section 5.4(d) ambiguous.

B

Even if the majority is correct that Susquehanna waived the above argument with respect to the <u>third</u> condition in section 5.4(d), the second condition in section 5.4(d) is likewise ambiguous. It provides that "no timely filed request for administrative or judicial review, reconsideration or stay is pending" "with respect to" the FCC order at issue. The majority concludes that, because no such review of the Construction Permit itself was pending on or before May 23, 2003, the second condition is also satisfied.

Whereas I agree that no review of the Construction Permit itself was pending on or before May 23, 2003, I do not agree that this fact is dispositive, due to the language of the Construction Permit. Paragraph 7 of the Construction Permit expressly provides that

21

> The grant of this permit is conditioned on the final outcome of [a pending request for review of the Reallotment R&O]. The final outcome of that proceeding may require WHMA-FM to change frequency, class, or site location. Accordingly, any construction undertaken pursuant to this permit is at the permittee's sole risk.

(emphasis added). The Permit was thus conditioned upon the successful completion of the already pending administrative and judicial review of the Reallotment R&O, and contemplated the possibility that, if the review turned out unfavorably to Susquehanna, the Construction Permit would have to be rescinded.

The question, then, is whether the contractual language, when referring to "administrative or judicial review," means only direct administrative or judicial review of the Construction Permit, or whether it means "administrative or judicial review" related to the Construction Permit. Whereas, in most cases, this distinction would be without a difference, the opposite is true here because the FCC's grant of the Construction Permit was, in its own terms, conditioned upon the successful completion of review of the Reallotment R&O. That is, if the purpose of the second condition of section 5.4(d) is to ensure that no further review is pending that could jeopardize the finality of the Construction Permit, it is obviously not satisfied where, as here, the Permit is conditioned upon judicial review of other FCC orders. As such, administrative or judicial review of the Reallotment R&O is administrative or judicial review "with respect to" the Construction Permit.

22

At the very least, the conditional nature of the Construction Permit renders the relevant contractual language ambiguous — it could refer either to review of only the Construction Permit, or, separately, review related to the Permit, including, in this case, review of the Reallotment R&O.[4] Under the latter reading, the second condition was not satisfied.

The majority completely ignores the conditional nature of the Construction Permit. It recognizes, as it must, that the Permit "is conditioned" upon completion of the administrative or judicial review of the Reallotment R&O, but then asserts that the condition is no condition at all. Instead, according to the majority, "Paragraph 7 merely reiterates a fact known to both parties at the time of contracting—i.e., if the FCC granted Susquehanna a Reallotment R&O and a CP, but then revoked the Reallotment R&O, Susquehanna's CP alone would not enable it to broadcast the Station from College Park." Ante at 10 n.5. Thus, in one sentence, the majority concludes that the condition in the Construction Permit

---

[4] The majority also asserts that "the FCC's certification that 'no request for administrative or judicial review, reconsideration, or stay has been filed with respect to [the CP]' indicates the FCC did not consider [the] challenges to the Reallotment R&O as challenges to the CP as well." Ante at 11 n.4 (first alteration in original). Such a conclusion hardly follows from the premise. There is absolutely no record evidence that the FCC took such a position as to the second condition of section 5.4(d). What record evidence there is with respect to the FCC's position — to wit, the language of its Construction Permit — is to the contrary, and suggests that the FCC, in certifying that there was no request for review of the CP, was verifying only that no direct review of the CP had been sought.

23

means nothing — it "merely reiterates a fact known to both parties at the time of contracting" — and at the same time acknowledges that it means everything, for without the Reallotment R&O, there could not be a Construction Permit. It strikes me as paradoxical to note the language of the Construction Permit and yet refuse to give the word "conditioned" any meaning at all.

Second, in rejecting the contractual language described above, the majority offers little more than an ipse dixit — that the parties would have used other language if they meant to require that the Reallotment R&O become a "Final Order" before the Construction Permit could follow suit. This assertion, however, overlooks one critical fact: The condition in the Construction Permit linking the Permit to the judicial review of the Reallotment R&O was created by the FCC, several years after the contract was formed. Thus, the parties may not have initially intended for the Construction Permit to be conditioned upon the successful completion of judicial review of the Reallotment R&O, but the FCC subsequently required as much when it issued the Permit. Whether the parties would have intended for such an external condition to control the finality of the Construction Permit is the very question that the ambiguous nature of section 5.4(d) should foreclose us from answering at this stage. Instead, the majority reads into the contractual language evidence of an intent to reject a condition that did

not exist at the time, even though, as the majority itself emphasizes, "we may not 'make a new contract for the parties under the guise of interpreting the writing.'" Ante at 11 n.4 (quoting <u>Vt. Teddy Bear Co. v. 538 Madison Realty Co.</u>, 807 N.E.2d 876, 879 (N.Y. 2004) (internal quotation marks omitted)).

At bottom, then, the language of the Construction Permit renders section 5.4(d) ambiguous as to when the "administrative or judicial review" "with respect to" the Permit became final.

II

Even though this case is a fairly routine breach-of-contract action, and is sufficiently fact-specific that it is hard to see how our decision will have lasting relevance to anyone other than the parties, there is something deeply flawed with the majority's methodology. I recognize, as I must, that reasonable minds can read similar contractual language differently, and that my own reading of section 5.4(d) may not be that which my colleagues would adopt, were a choice of competing interpretations the sole purpose for which our jurisdiction was invoked. Indeed, it is an inescapable truism that, in many cases that come before our court, two votes for one interpretation of language will trump one vote for a contrary view.

But this case, like some others, belongs in a different class, for our analysis is centered on the question of ambiguity — where differences in interpretation

should almost always compel the same conclusion: that the relevant language is ambiguous.[5] Given that observation, I cannot agree that the majority's reading of section 5.4(d), the shortcomings of which they <u>admit</u>, is the only plausible one.

The result the majority reaches today might have ultimately proven to be the correct one on remand, but only if things are true about the parties' intent vis-a-vis the contract that we do not yet know. Especially because much turns on the language of the Construction Permit, which came well after formation of the contract, extrinsic evidence, including the parol evidence rule, would likely have proven central to resolution of the intent of the parties, and of the interaction between the Construction Permit and section 5.4(d). That is why summary judgment is manifestly inappropriate at this stage of the litigation, and that is why I must dissent.

---

[5] The majority responds to this analysis by suggesting that "the dissent's critique overlooks the well-established principle of contract interpretation that ambiguity does not exist simply because the parties urge different interpretations of a contract's terms." <u>Ante</u> at 15 n.7. Again, such an assertion, while a correct statement of the law, is entirely beside the point. The analysis contained herein amply demonstrates that the relevant contractual language reasonably admits of more than one interpretation—and that the majority's interpretation itself may be <u>unreasonable</u>. In short, the ambiguity in this case "does not exist simply because the parties urge different interpretations of a contract's terms." It exists because the contract is patently ambiguous in the relevant respects, for the reasons I have set forth above.